## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

Mackenzie Irwin, individually and on
behalf of all others similarly situated,

Plaintiff,

- against -

Walmart Inc.,

Defendant

Class Action Complaint

Jury Trial Demanded

Plaintiff alleges upon information and belief, except for allegations pertaining

to Plaintiff, which are based on personal knowledge:

1.     Walmart Inc. ("Defendant") sells fruit and grain cereal bars with fruit

flavors like mixed berry, cherry, apple and cinnamon, strawberry and blueberry

under its Great Value brand ("Products").





2. The labeling is misleading because it represents and omits that the taste of the characterizing fruit filling ingredients, i.e., cherries and apples, is only from those fruit ingredients and/or natural flavoring ingredients and does not include artificial flavoring ingredients which partially provide their cherry and apple taste.

## I.   MEANING OF TERM "NATURAL" AND VARIATIONS

3. Consumers understand "natural" in the context of food to mean that nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in that food.

4. A large majority of consumers prefer foods with natural instead of artificial ingredients for several reasons.

5. First, over half of consumers believe that foods with artificial ingredients are less healthy compared to those with only natural ingredients.

6.     Second, more than half of the public wants to consume foods that are closer to their original form, in the context of a packaged food, instead of having been highly processed.

7.     Third, consumers believe that foods with natural ingredients are better for the environment than those laden with synthetic ingredients and made through artificial processes.

8.     Fourth, "the preference for natural products appeals to a moral ideology and offers a moral satisfaction."[1]

9.     According to a recent Nielsen survey, a significant majority of consumers are willing to pay more for foods with natural ingredients as opposed to artificial ingredients.

## II.   CONSUMER AVOIDANCE OF ARTIFICAL FLAVORS

10.     According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[2]

---

[1] Rozin, P., Spranca, M., Krieger, Z., Neuhaus, R., Surillo, D., Swerdlin, A., & Wood, K. (2004). Preference for natural: Instrumental and ideational/moral motivations, and the contrast between foods and medicines. Appetite, 43(2), 147-154.

[2] Lauren Manning, How Big Food Is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.

11.   According to Paul Manning, chief executive officer and president of Sensient Technologies, "Consumer desire for naturally flavored products is an emerging trend."[3]

12.   According to Consumers Union, over 80% of consumers expect that the word "natural," in almost any context, on a food label means that a food does not contain any artificial ingredients.

13.   Explanations for why consumers prefer foods containing natural, instead of artificial ingredients, are varied.

14.   Consumers seek to avoid artificial flavors because they are weary of ingredients which are highly processed with chemical additives and synthetic solvents in laboratories.

15.   According to Nielsen's Global Health & Wellness Survey, the absence of artificial flavors is very important for over 40% of consumers.

16.   The trade journal, Perfumer & Flavorist, described "The Future of Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[4]

---

[3] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

[4] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.

4

17.   Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in its Report, "Artificial: Public Enemy No. 1."[5]

18.   Almost half of Americans seek out foods with natural flavorings, compared to then ten percent who prefer artificial flavorings.

19.   A recent survey shows more than three in four people worldwide are convinced that artificial flavors have no place on their ingredient lists.[6]

20.   According to Forbes, 88% of consumers consider foods without artificial flavors to be more natural and healthier than foods with artificial flavors and would pay more for such foods.

21.   Surveys by Nielsen, New Hope Network, and Label Insight concluded that between sixty and eighty percent of the public tries to avoid artificial flavors.

## III.  FLAVOR SOURCE REQUIRED TO BE DISCLOSED

22.   Research shows that "consumers initially [] rely on extrinsic cues such

---

[5] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

[6] What 'Natural' Really Means to Consumers GNT Group's Guide to Global Consumer Demands attests importance of natural colors for future-proof products, July 13, 2017.

as visual information on labels and packaging to evaluate [any] product," thereby "develop[ing] sensory expectations" about attributes such as its taste and the source of that taste.[7]

23.   The Food and Drug Administration ("FDA") was aware of the importance of disclosing the source of a food or beverage's flavor to consumers when it acted at the direction of Congress to establish consistent rules to facilitate consumer choice and prevent deception.[8]

24.   First, it defined a flavor as a substance whose function is to impart taste. 21 C.F.R. § 101.22(a)(1) and (3).

25.   Second, it required that that whenever "[a] label, labeling, or advertising of a food makes any direct or indirect representations with respect to [a] primary recognizable flavor(s), by word, vignette, e.g., depiction of a fruit, or other means," it is considered its "characterizing flavor," and its source must be disclosed to

---

[7] Lancelot Miltgen, Caroline, Gaëlle Pantin Sohier, and Bianca Grohmann. "Communicating sensory attributes and innovation through food product labeling." Journal of food products marketing 22.2 (2016): 219-239; Blackmore, Helena, Claire Hidrio, and Martin R. Yeomans. "A taste of things to come: The effect of extrinsic and intrinsic cues on perceived properties of beer mediated by expectations." Food Quality and Preference 94 (2021): 104326; Okamoto, Masako, and Ippeita Dan. "Extrinsic information influences taste and flavor perception: A review from psychological and neuroimaging perspectives." Seminars in cell & developmental biology. Vol. 24. No. 3. Academic Press, 2013.
[8] This State adopted these identical federal regulations.

consumers. 21 C.F.R. § 101.22(i)(1).

26.   According to one scholar, this rule "is premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two."[9]

27.   The FDA defined natural flavor as referring to the "essential oil, oleoresin, essence or extractive" from fruits or vegetables, "whose significant function [] is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

28.   Artificial flavor was defined as "any substance, the function of which is to impart flavor" from sources other than fruits or vegetables. 21 C.F.R § 101.22(a)(1).

29.   Flavor compounds of vegetables include (1) nonvolatiles like sugars, amino acids, fatty acids, and organic acids and (2) volatiles like aromatic hydrocarbons, aldehydes, acetals, ketones, alcohols, esters, and sulfur compounds.

## IV.  FLAVOR PROPERTIES OF CHERRIES AND APPLES

30.   The last decade has seen a shift in consumer preferences from intensely sweet tastes to tarter and sour flavors.[10]

---

[9] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.
[10] Stephanie Cernivec, Beverage-makers take the sour with the sweet, Beverage Industry, May 10, 2013.

31.   The result has been increased demand for fruit flavors such as apple and cherry.

32.   Taste is a combination of sensations arising from specialized receptor cells in the mouth.[11]

33.   Taste is defined as sensations of sweet, sour, salty, bitter, and umami.

34.   Taste is complex, with the taste of sour including the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples and cherries (malic acid), and wines (tartaric acid).

35.   Each of those acids is responsible for unique sensory characteristics of sourness.

36.   Consumer acceptability of the flavor of cherries and apples is based on their perceived sweetness, sourness, and tartness.

37.   The prototypical cherry and apple taste is based on the interaction of their free sugars, mainly glucose and fructose, volatile compounds and their first predominant acid of malic acid to create their unique sour, tart and sweet flavors.[12]

| Fruit | First Predominant Acids | Second Predominant Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Citric Acid | Malic Acid |

---

[11] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).
[12] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

8

| | | |
|---|---|---|
| Blueberry | Citric Acid | Malic Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid, Succinic Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Chili Peppers (habanero) | Citric Acid | Malic Acid, Succinic Acid |
| Coconut | Malic Acid | Citric Acid |
| Dragon fruit | Malic Acid | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Kiwi | Quinic Acid, Citric Acid | Malic Acid |
| Lemon | Citric Acid | Malic Acid |
| Lime | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%) | Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry | Citric Acid | Malic Acid, Tartaric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

38.   L-Malic acid gives cherries and apples their characteristic tart, sour and slightly sweet taste valued by consumers.[13]

39.   Malic acid is often referred to as "apple acid," with the word malic derived from the Latin mālum, for which Malus, the genus that contains all apple

---

[13] Girard, B., and T. G. Kopp. "Physicochemical characteristics of selected sweet cherry cultivars." Journal of Agricultural and Food Chemistry 46.2 (1998): 471-476.

species, is named.

## V.   CHEMICAL STRUCTURE OF MALIC ACID

40.   Malic acid is the common name for 1-hydroxy-1, 2- ethanedicarboxylic acid.

41.   Malic acid has two isomers, or arrangements of atoms, L-Malic Acid and D-Malic Acid. 21 C.F.R. § 184.1069.

42.   An isomer is a molecule sharing the same atomic make-up as another but differing in structural arrangements.[14]

43.   Stereoisomers differ by spatial arrangement, meaning different atomic particles and molecules are situated differently in any three-dimensional direction.

44.   An enantiomer is a type of stereoisomer and like right and left-hand versions of the same molecular formula.

45.   D-Malic Acid and L-Malic Acid are enantiomers with almost identical skeletal formulas.



---

[14] Dan Chong and Jonathan Mooney, Chirality and Stereoisomers (2019).

46. L-Malic Acid occurs naturally in cherries and apples, while D-Malic Acid does not occur naturally anywhere.

47. D-Malic Acid is most commonly found as a racemic mixture of the D and L isomers, or DL-Malic Acid, commercially made from petroleum.

48. DL-Malic Acid is synthetically produced from petroleum in a high-pressure, high-temperature, catalytic process with chemical reactions.

## VI. LABEL OMITS ADDED ARTIFICIAL FLAVORING

49. The characterizing or primary flavor of the cherry variety is "cherry," because the label makes "direct [] representations" about this fruit through the word "Cherry," pictures of cherries and red fonts associated with the color of this fruit. 21 C.F.R. § 101.22(i).

50. A characterizing or primary flavor of the apple and cinnamon variety is "apple," because the label makes "direct [] representations" about this fruit through the word "Apple," pictures of apples and green fonts associated with the color of this fruit. 21 C.F.R. § 101.22(i).

51. Federal and identical state regulations require the Products to disclose the source of their cherry and apple flavor on the front label, i.e., from cherries and apples, natural sources other than cherries and apples and/or artificial, synthetic sources. 21 C.F.R. § 101.22(i).

52. Federal and state regulations require that because the Products contain

11

DL-Malic Acid that imparts the flavor of cherries and apples, "Cherry" and "Apple" are required to "be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Cherry [Apple] [and Cinnamon] Flavored" or "Artificially Flavored Cherry [Apple] [and Cinnamon]." 21 C.F.R. § 101.22(i)(2).

53.   By representing the cherry variety as having a cherry taste and being "naturally flavored," consumers will expect its cherry taste to be from cherries and natural flavoring ingredients which simulate and provide that cherry taste.

54.   By representing the apple variety as having an apple taste without any disclosure of added flavoring, consumers will expect its apple taste to be entirely from apples.

55.   Though the filling ingredients for the apple and cherry varieties list "Cherry Puree" and "Apple Puree Concentrate," they also include "Malic Acid."

> Cherry
>
> INGREDIENTS: CHERRY FLAVORED FILLING (SUGAR, CORN SYRUP, CHERRY PUREE, GLYCERIN, WATER, APPLE POWDER, PECTIN, XANTHAN GUM, SODIUM ALGINATE, SODIUM CITRATE, MONO- AND DIGLYCERIDES, CITRIC ACID, MALIC ACID, DICALCIUM PHOSPHATE, NATURAL FLAVOR, BLACK CARROT JUICE FROM CONCENTRATE [COLOR], BETA CAROTENE [COLOR])

Apple Cinnamon

INGREDIENTS: APPLE FILLING (INVERT SUGAR, CORN SYRUP, APPLE PUREE CONCENTRATE, SUGAR, GLYCERIN, MODIFIED CORN STARCH, SODIUM ALGINATE, METHYLCELLULOSE, MALIC ACID, MONOCALCIUM PHOSPHATE, GROUND CINNAMON, DICALCIUM PHOSPHATE, CITRIC ACID, APPLE JUICE [FOR COLOR]),

56. Laboratory analysis using chiral HPLC and/or enzymatic methods with D-malate dehydrogenase (D-MDH) concluded that the malic acid used in one or both Products was the artificial DL-Malic Acid, by identifying the synthetic D-isomer.

57. This was because D-Malic acid was preferentially oxidized over L-Malic acid.

58. The combination of DL-Malic Acid with sugars is not equivalent to the natural flavors from cherries and apples.

59. The addition of DL-Malic Acid imparts, creates, simulates, resembles and/or reinforces the sour, tart, sweet taste that cherries and apples are known for.

60. Defendant could have added more cherry and apple ingredients or L-Malic Acid from cherries and apples but used artificial DL-Malic Acid because it cost less and/or more accurately simulated, resembled, and/or reinforced the taste of

13

cherries and apples.

61.   DL-Malic Acid is not a "natural flavor" as defined by federal and state regulations, because it is not from a fruit, vegetable or other natural source, but from petroleum and made through chemical reactions.

62.   DL-Malic Acid does not supplement, enhance, or modify the original taste of cherries and apples, because it is a core component of these fruits. 21 C.F.R. § 170.3(o)(11).

## JURISDICTION AND VENUE

63.   Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

64.   The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

65.   Plaintiff is a citizen of Florida.

66.   Defendant is a citizen of Delaware and Arkansas.

67.   The class of persons Plaintiff seeks to represent includes persons who are citizens of a different state from which Defendant is a citizen.

68.   The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Products are sold at hundreds of Defendant's stores across Florida.

69.   Venue is in the Tampa Division in this District because Plaintiff resides

in Hillsborough County and a substantial part of the events or omissions giving rise to these claims occurred in Hillsborough County, her purchase and consumption of the Products in reliance on the labeling identified here.

## **PARTIES**

70.   Plaintiff Mackenzie Irwin is a citizen of Hillsborough County, Florida.

71.   Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Bentonville, Arkansas, Benton County.

72.   Walmart is an American multinational retail corporation that operates over 5,000 supercenters throughout the nation, selling everything from furniture to groceries.

73.   While Walmart sells leading national brands, they sell hundreds of products under their private label Great Value brand.

74.   Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

75.   Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

76.   Products under the Great Value brand have an industry-wide reputation for quality and value.

77.   In releasing products under the Great Value brand, Defendant's foremost

criteria was to have high-quality products that were equal to or better than the national brands.

78.   Defendant gets national brands to produce its private label items due to its loyal customer base and tough negotiating.

79.   That Great Value-branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

80.   Private label products generate higher profits for Walmart because national brands spend significantly more on marketing, contributing to their higher prices.

81.   A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

82.   Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand overall.

83.   The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Walmart products.

84.   The Products are available to consumers from Defendant's retail stores and its website.

85.   Plaintiff read "Naturally Flavored – Cherry" and/or "Apple Cinnamon," saw the pictures of the cherries and/or apples, the fonts in red and/or green and took

notice that the front labels lacked any references to artificial flavoring that provided the Products' cherry and apple taste.

86.   Plaintiff expected the Products' cherry and apple taste was from cherries and natural flavoring ingredients that provided a cherry taste and/or apples.

87.   Plaintiff is part of the majority of consumers who avoid artificial flavors for the above-identified reasons related to health, nutrition and the environment.

88.   Plaintiff was unaware the Products contained artificial flavoring ingredients to provide their cherry and apple taste because this was not disclosed to her on the front label, which is where she would have expected to see this information.

89.   Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, and/or images on the Products, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Products and separately, through in-store, digital, audio, and print marketing.

90.   Plaintiff purchased the Products on one or more occasions within the statutes of limitations for each cause of action alleged, at Walmart locations in Hillsborough County, between August 2021 and the present.

91.   Plaintiff bought the Products at or exceeding the above-referenced price.

92.   Plaintiff chose between Defendant's Products and products represented

17

similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components such as the source of their fruit taste.

93.   Defendant sold more of the Products and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

94.   As a result of the false and misleading representations, the Products are sold at a premium price, approximately no less than $2.13 for 8 bars (295 g), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than they would be sold for absent the misleading representations and omissions.

95.   Plaintiff paid more for the Products than she would have paid had she known the representations were false and misleading, as she would not have bought them or paid less.

96.   Plaintiff intends to, seeks to, and will purchase the Products again when she can do so with the assurance their representations are consistent with their composition.

97.   Plaintiff is unable to rely on the labeling and representations not only of these Products, but other similar products which represent the source of their main fruit flavoring ingredients because she is unsure whether those representations are truthful.

98.   If Defendant's labeling were to be truthful, Plaintiff could adequately rely on the labeling of other fruit flavored products.

## CLASS ALLEGATIONS

99.   Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following class:

> **Florida Class:** All persons in the State of Florida who purchased the Products within the statutes of limitations for each cause of action alleged.

100. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

101. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

102. Plaintiff is an adequate representative because her interests do not conflict with other members.

103. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

104. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

19

105. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

106. Plaintiff seeks class-wide injunctive relief because the practices continue.

## CAUSES OF ACTION

## COUNT I

### Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*

107. Plaintiff incorporates by reference preceding paragraphs 1-63.

108. Plaintiff brings this claim on her own behalf and on behalf of each member of the Florida Class.

109. Defendant violated and continues to violate Florida's Deceptive and Unfair Trade Practices Act by engaging in unfair methods of competition, unconscionable acts and practices, and unfair and deceptive acts and practices in the conduct of its business.

110. Defendant misrepresented the Products through statements, omissions, ambiguities, half-truths and/or actions, that their cherry and/or apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

111. The material misstatements and omissions alleged herein constitute

deceptive and unfair trade practices, in that they were intended to and did deceive Plaintiff and the general public into believing that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

112. Plaintiff and class members relied upon these representations and omissions of any front label disclosure about artificial flavoring in deciding to purchase the Products.

113. Plaintiff's reliance was reasonable because of Defendant's reputation as a trusted and reliable company, known for its high-quality products, honestly marketed to consumers.

114. Plaintiff and class members would not have purchased the Products or paid as much if the true facts had been known, suffering damages.

115. Defendant's conduct offends established public policy and is immoral, unethical, oppressive, and unscrupulous to consumers.

116. Plaintiff and class members are entitled to damages in an amount to be proven at trial.

117. Defendant should also be ordered to cease its deceptive advertising and should be made to engage in a corrective advertising campaign to inform consumers that the Products contains artificial flavoring ingredients that supply part of their characterizing cherry and apple taste.

## COUNT II

### False and Misleading Adverting,
### Fla. Stat. § 817.41

118. Plaintiff incorporates by reference preceding paragraphs 1-63.

119. Plaintiff brings this claim on her own behalf and on behalf of each member of the Florida Class.

120. Defendant made misrepresentations and omissions of material fact, that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients, through its advertisements and marketing, through various forms of media, product descriptions, and targeted digital advertising.

121. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

122. Defendant knew that these statements were false.

123. Defendant intended for consumers to rely on its false statements for the purpose of selling the Products.

124. Plaintiff and class members did in fact rely upon these statements.

125. Reliance was reasonable and justified because of Defendant's reputation as a trusted and reliable company, known for its high-quality products, honestly marketed to consumers.

22

126. As a result of Defendant's misrepresentations, Plaintiff and class members suffered damages in the amount paid for the Products.

127. Plaintiff and class members are entitled to damages and injunctive relief as set forth above.

## COUNT III

### Breaches of Express Warranty,
### Implied Warranty of Merchantability/Fitness for a Particular Purpose and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

128. Plaintiff incorporates by reference preceding paragraphs 1-63.

129. The Products were manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that their cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

130. Defendant directly marketed the Products to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

131. Defendant knew the product attributes that potential customers like Plaintiff were seeking, such as flavoring provided from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients and developed its marketing and labeling to directly

23

meet those needs and desires.

132. The representations were conveyed in writing and promised the Products would be defect-free, and Plaintiff understood this meant that their cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

133. Defendant affirmed and promised that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

134. Defendant described the Products so Plaintiff and consumers believed their cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients, which became part of the basis of the bargain that it would conform to their affirmations and promises.

135. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Products.

136. This duty is based on Defendant's outsized role in the market for these type of products, custodian of the Walmart brand, a trusted seller of a variety of products for decades.

137. Plaintiff recently became aware of Defendant's breach of the Products' warranties.

24

138. Plaintiff provided or provides notice to Defendant, its agents, representatives, retailers, and their employees that it breached the Products' express and implied warranties associated with the Products.

139. Defendant received notice and should have been aware of these issues due to complaints by third parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

140. The Products did not conform to their affirmations of fact and promises due to Defendant's actions.

141. The Products were not merchantable because they were not fit to pass in the trade as advertised, not fit for the ordinary purpose for which they were intended and did not conform to the promises or affirmations of fact made on their packaging, containers, or labels, because they were marketed as if their cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

142. The Products were not merchantable because Defendant had reason to know the particular purpose for which the Products were bought by Plaintiff, because she expected their cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients and she relied on Defendant's skill and judgment to select or furnish such suitable products.

25

## COUNT IV

## Fraud
### (Fed. R. Civ. P. 9(b) Allegations)

143. Plaintiff incorporates by reference preceding paragraphs 1-63.

144. Defendant misrepresented that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients, by omitting the required "artificially flavored" disclosure from the front label.

145. The records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of this falsity and deception, through statements and omissions.

146. Rule 9(b) of the Federal Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

147. To the extent necessary, as detailed in the paragraphs above and below, Plaintiff has satisfied the requirements of Rule 9(b) by establishing the following elements with sufficient particularity.

148. WHO: Defendant, Walmart, made material misrepresentations and/or omissions of fact in its advertising and marketing of the Products by representing that their cherry and apple taste was from cherry ingredients or natural flavoring

ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

149. WHAT: Defendant's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

150. Defendant omitted that the Products contain artificial flavoring to provide their cherry and apple taste.

151. Defendant knew or should have known this information was material to all reasonable consumers and impacts consumers' purchasing decisions.

152. Yet, Defendant has and continues to represent that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

153. WHEN: Defendant made material misrepresentations and/or omissions detailed herein, including that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients, continuously throughout the applicable Class period(s) and through the filing of this Complaint.

27

154. WHERE: Defendant's material misrepresentations and omissions, that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients, were made in the advertising and marketing of the Products, on the front of the packaging which all consumers buying it will inevitably see and take notice of.

155. HOW: Defendant made written and visual misrepresentations and omissions in the advertising and marketing of the Products, that their cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients.

156. As such, Defendant's representations are false and misleading.

157. And as discussed in detail throughout this Complaint, Plaintiff and class members read and relied on Defendant's representations and omissions before purchasing the Products.

158. WHY: Defendant misrepresented that the Products' cherry and apple taste was from cherry ingredients or natural flavoring ingredients that provided a cherry taste and apple ingredients and not added artificial flavoring ingredients for the express purpose of inducing Plaintiff and class members to purchase the Products at a substantial price premium, in part based on consumer demand for products without artificial flavoring ingredients.

159. As such, Defendant profited by selling the misrepresented Products to thousands of consumers throughout the State of Florida.

## COUNT V

### Unjust Enrichment

160. Plaintiff incorporates by reference preceding paragraphs 1-63.

161. Defendant obtained benefits and monies because the Products were not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

## JURY DEMAND AND PRAYER FOR RELIEF

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Awarding monetary, statutory, and/or punitive damages pursuant to applicable laws;

4. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

5.  Other and further relief as the Court deems just and proper.

Dated:   July 13, 2023

Respectfully submitted,

/s/ *William Wright*

The Wright Law Office, P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com

*Lead Counsel for Plaintiff*

Sheehan & Associates, P.C.
Spencer Sheehan*
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com

*Pro Hac Vice* Application Forthcoming

30