## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

### TAMPA DIVISION

MACKENZIE IRWIN, individually and
on behalf of all others similarly situated,

Plaintiff,

- against -

WALMART INC.,

Defendant

8:23-cv-01582-MSS-UAM

First Amended
Class Action Complaint

Jury Trial Demanded

Plaintiff Mackenzie Irwin ("Plaintiff") alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

## I.    CONSUMER AVOIDANCE OF ARTIFICIAL FLAVORS

1.    According to the Wall Street Journal, "As consumer concern rises over artificial ingredients, more food companies are reconstructing recipes" to remove artificial flavors.[1]

2.    Recent surveys report that over eighty percent of Americans believe that foods with artificial flavor are less healthy than those with only natural flavors.

3.    According to Nielsen, the absence of artificial flavors is very important for over 40% of respondents to their Global Health & Wellness Survey.

4.    The trade journal, Perfumer & Flavorist, described "The Future of

---

[1] Lauren Manning, How Big Food is Using Natural Flavors to Win Consumer Favor, Wall Street Journal.

Artificial Flavors & Ingredients" as bleak, given consumer opposition to these synthetic ingredients.[2]

5.  Mintel announced that consumer avoidance of artificial flavors is just as strong as their desire for natural flavors, in "Artificial: Public Enemy No. 1."[3]

6.  Surveys by Nielsen, New Hope Network, and Label Insight concluded that between sixty and eighty percent of the public tries to avoid artificial flavors.

## II.   LEGAL BACKGROUND

7.  Over 100 years ago, consumers were similarly concerned, based on the reports of muckraking journalists, about the harmful and untested chemicals added to their food.

8.  In response to this unregulated environment where synthetic molecules manufactured in laboratories substituted for the wholesome ingredients promoted on food packaging, the Pure Food and Drug Act of 1906 required disclosure of artificial flavoring to ensure the public would get what they paid for.

9.  These requirements were strengthened when Congress adopted the

---

[2] Jim Kavanaugh, The Future of Artificial Flavors & Ingredients, Perfumer & Flavorist, June 12, 2017.

[3] Alex Smolokoff, Natural color and flavor trends in food and beverage, Natural Products Insider, Oct. 11, 2019; Thea Bourianne, Exploring today's top ingredient trends and how they fit into our health-conscious world, March 26-28, 2018; Nancy Gagliardi, Consumers Want Healthy Foods – And Will Pay More For Them, Forbes, Feb 18, 2015.

Federal Food, Drug and Cosmetic Act ("FFDCA") in 1938. 21 U.S.C. § 301 *et seq.*

10.   Florida adopted these laws through the Food Safety Act ("FSA") and accompanying regulations. Fla. Stat. § 500.01 *et seq.*; Fla. Stat. § 500.02(2) ("Provide legislation which shall be uniform, as provided in this chapter, and administered so far as practicable in conformity with the provisions of, and regulations issued under the authority of, the [FFDCA]."); FL Admin Code § 5K-4.002(1)(d) (adopting 21 C.F.R. Parts 101 and 102).

11.   The responsibility to devise a system that prevented the substitution of valued ingredients like fruits and their natural flavors for untested and synthetic flavoring was tasked to the newly established Food and Drug Administration ("FDA").

12.   Beyond the potential to cause physical harm, these synthetic substances were significantly cheaper than the ingredients and their natural flavor components they replaced.

13.   To facilitate an honest marketplace and protect consumers, the  rules required that the source of a food's taste, whether the pictured ingredients, or natural or artificial flavorings, be conspicuously disclosed to the buyer as part of a food's name. 21 C.F.R. § 101.22(i)(1).

14.   According to one scholar, this rule "is premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely

on the label to readily distinguish between the two."[4]

15.    This was supported by research showing that "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" to make quick purchasing decisions.[5]

16.    To reach this goal, the FDA defined a flavor as a substance which imparts taste. 21 C.F.R. §§ 101.22(a)(1) and (3).

17.    Then, it defined natural flavor as the "essential oil, oleoresin, essence or extractive" from fruits or vegetables, "whose significant function [] is flavoring rather than nutritional." 21 C.F.R § 101.22(a)(3).

18.    In contrast to natural flavors, artificial flavor refers to "any substance, the function of which is to impart flavor" from synthetic or chemical sources. 21 C.F.R § 101.22(a)(1).

## III.  FLAVOR OF CHERRIES

19.    Taste is a combination of sensations arising from specialized receptor

---

[4] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

[5] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

cells in the mouth.[6]

20.   Taste is complex, because, for instance, the taste of sour includes the sourness of vinegar (acetic acid), sour milk (lactic acid), lemons (citric acid), apples (malic acid), and wines (tartaric acid).

21.   Each of those acids is responsible for unique sensory characteristics of sourness.

22.   Fruit flavors, including the flavor of cherries, are the sum of the interaction between their nonvolatile compounds, such as sugars and organic acids, and volatile compounds, including aromatic hydrocarbons, aldehydes, ketones and esters.

23.   The prototypical sweet, tart, sour and fruity taste of cherries is based on the interaction of their free sugars, glucose and fructose, with its predominant organic acid of malic acid.[7]

| Fruit | First Predominant Acids | Second Predominant Acids |
|---|---|---|
| Apple | Malic Acid (95%) | Tartaric Acid, Fumaric Acid |
| Apricot | Malic Acid (70%) | Citric Acid, Tartaric Acid |
| Blackberry | Malic Acid | Citric Acid |
| Blueberry (Highbush, Jersey) | Malic Acid | Citric Acid, Quinic Acid |
| Cherry | Malic Acid (94%) | Tartaric Acid |
| Cherry (Tropical) | Malic Acid (32%) | Citric Acid |
| Chili Pepper (habanero) | Citric Acid | Malic Acid, Succinic Acid |

---

[6] Gary Reineccius, Flavor Chemistry and Technology § 1.2 (2d ed. 2005).
[7] Y.H. Hui, et al., Handbook of Fruit and Vegetable Flavors, p. 693 (2010).

| | | |
|---|---|---|
| Coconut | Malic Acid | Citric Acid |
| Cranberries (American varietals) | Malic Acid (64%) | Citric Acid |
| Dragon fruit | Malic Acid | Citric Acid |
| Grape | Malic Acid (60%) | Tartaric Acid |
| Grapefruit | Citric Acid | Malic Acid |
| Guava | Citric Acid | Malic Acid |
| Kiwi | Quinic Acid, Citric Acid | Malic Acid |
| Lemon | Citric Acid | Malic Acid |
| Lime | Citric Acid | Malic Acid |
| Mango | Citric Acid | Malic Acid, Tartaric Acid |
| Orange | Citric Acid | Malic Acid |
| Peach | Malic Acid (73%) | Citric Acid |
| Pear | Malic Acid (77%) | Citric Acid |
| Pineapple | Citric Acid | Malic Acid |
| Pomegranate | Malic Acid (>50%) | Citric Acid (>22%) |
| Raspberry | Citric Acid | Malic Acid, Tartaric Acid |
| Strawberry (wild pentaploid, Turkish cultivars) | Malic Acid, Tartaric Acid | Citric Acid |
| Tamarind | Tartaric Acid | Citric Acid, Malic Acid |
| Watermelon | Malic Acid (99%) | Fumaric Acid |

24.   For cherries, malic acid is the first predominant acid, representing 94%, or almost the entire amount, of organic acids responsible for their sour, sweet, tart and fruity taste.

## IV.  LABELING AND INGREDIENTS

25.   According to Paul Manning, president of Sensient Technologies,

6

"Consumer desire for naturally flavored products is an emerging trend."[8]

26.   To capture this trend, Walmart Inc. ("Defendant") sells Fruit & Grain Cereal Bars with pictures of an overflowing bowl of ripe, freshly picked cherries, with its filling described as "Cherry Naturally Flavored" and "Made with Real Fruit Filling" under the Great Value brand ("Product").



27.   The labeling is false and misleading because despite the representations that the cherry taste was due to the Product being "Naturally Flavored" and that it was "Made with Real Fruit Filling," its taste is provided by artificial flavoring ingredients.

---

[8] Keith Nunes, Using natural ingredients to create authentic, fresh flavors, Food Business News, Sept. 20, 2018.

28. This is not disclosed on the front label or the fine print on the back in the ingredient list.

29. While the ingredient list in fine print on the back indicates the fruit filling contains cherries and natural flavor, it also includes malic acid.



**INGREDIENTS:** <mark>CHERRY FLAVORED FILLING</mark> (SUGAR, CORN SYRUP, <mark>CHERRY PUREE</mark>, GLYCERIN, WATER, APPLE POWDER, PECTIN, XANTHAN GUM, SODIUM ALGINATE, SODIUM CITRATE, MONO- AND DIGLYCERIDES, CITRIC ACID, <mark>MALIC ACID</mark>, DICALCIUM PHOSPHATE, <mark>NATURAL FLAVOR</mark>, BLACK CARROT JUICE FROM CONCENTRATE [COLOR], BETA CAROTENE [COLOR]), WHOLE OAT FLOUR…

30. Since the ingredients are listed in order of predominance by weight, the listing of "Malic Acid" before "Natural Flavor" means the Product contains more

artificial flavoring than natural flavoring. 21 C.F.R. § 101.4(a)(1).

A. Malic Acid

31.    Malic acid has two isomers, or arrangements of atoms, L-Malic Acid and D-Malic Acid. 21 C.F.R. § 184.1069.

32.    These are right and left-hand versions of the same molecular formula.[9]



33.    L-Malic Acid occurs naturally in cherries and is responsible for their characterizing fruity, sour, tart and/or sweet taste.

34.    D-Malic Acid does not occur naturally anywhere.

35.    D-Malic Acid is found as a racemic mixture of the D and L isomers, or DL-Malic Acid.

36.    The production of DL-Malic Acid begins with petroleum.

37.    It involves a catalytic process with numerous chemical reactions, including heating maleic anhydride with water under extreme pressure at 180°C.

38.    This results in an equilibrium mixture of malic and fumaric acids.

---

[9] Dan Chong and Jonathan Mooney, Chirality and Stereoisomers (2019).

39.   The soluble fumaric acid is filtered off and recycled, and the synthetic, or DL-, malic acid is concentrated and crystallized.

B. Distinguishing L- from DL- Malic Acid

40.   Since the two types of malic acid are closely related, companies may replace naturally occurring L-Malic Acid with the lower cost and synthetic DL-Malic Acid.

41.   According to Wilhelmsen, where adulteration involves the direct addition of a foreign substance, this can be detected provided there are well-defined detection limits, sufficiently validated detection methods and knowledge the adulterant and/or its marker are not found in the food product.[10]

42.   Any confirmed detection will be indicative of adulteration, without complicated statistical or other analysis.

43.   Since plants do not synthesize D-Malic acid, its presence in certain foods above established thresholds generally indicates synthetic malic acid has been added.

44.   The most accepted method used to determine if a food contains DL-Malic Acid is based, in part, on a standard adopted by the European Union for the enzymatic determination of the total content of D-malic acid in fruit juices and

---

[10] Eric C. Wilhelmsen, "Food Adulteration," in Food Science and Technology, Marcel Dekker (2004).

related products. EN 12138:1997.

45.    This enzymatic approach is based on D-malate dehydrogenase ("D-MDH"), an enzyme that oxidizes D-malic acid ("D-malate") to pyruvate and carbon dioxide in the presence of an appropriate cofactor.

46.    D-malate is oxidized by nicotinamide adenine dinucleotide ("NAD") to oxaloacetate.

$$\text{D-malate} + \text{NAD} \xrightarrow{\text{+ D-MDH}} \text{pyruvate} + CO_2 + \text{NADH} + H^+$$

47.    The oxaloacetate formed by this reaction is split into pyruvate and carbonic acid.

48.    The quantity of NADH formed is proportional to the concentration of D-malic acid and measured at a wavelength of 334, 340 or 365 nm.

49.    Laboratory analysis of the Product's fruit filling was performed based on this enzymatic method in accordance with accepted industry standards and protocols.

50.    Applying D-MDH, D-Malic acid was preferentially oxidized over L-Malic acid.

51.    The result was that the synthetic D-isomer of malic acid was identified, indicating the Product used artificial, DL-Malic Acid and not L-Malic Acid.

52.    Specifically, the amount detected was 0.044 g/100g, above the relevant threshold, confirming the use of synthetic malic acid.

53.    This confirmed the Product's fruit filling contains more artificial flavor than natural flavor, because malic acid is listed ahead of natural flavor on the ingredient list.

54.    The combination of DL-Malic Acid with the free sugars from cherries is not equivalent to the taste of cherries and natural flavors.

55.    The addition of DL-Malic Acid imparts, creates, simulates, resembles and/or reinforces the characteristic tart, sweet, sour and fruity taste that cherries are known for.

56.    DL-Malic Acid is not a "natural flavor" as defined by federal and state regulations, because it is not from a fruit, vegetable, or other natural source, but from petroleum, made through chemical reactions.

57.    DL-Malic Acid is an artificial flavoring ingredient.

58.    DL-Malic Acid does not supplement, enhance, or modify the original taste of cherries, because it is a core component of their taste, responsible for 94% of its organic acids. 21 C.F.R. § 170.3(o)(11).

59.    The Product could have included more cherries, L-Malic Acid from cherries or more natural flavors from sources other than cherries but used artificial DL-Malic Acid because it cost less and/or more accurately created, imparted, provided, simulated, resembled, and reinforced the taste of cherries.

## V.    "NATURALLY FLAVORED" AND OMISSION OF "ARTIFICIALLY

FLAVORED" MISLEADS CONSUMERS

60. In considering whether a food's label is misleading, it is required to "take[] into account, among other things, not only representations made or suggested by statement, word, design, [] or in any combination thereof, but also the extent to which the labeling or advertisement fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients in the food, which facts are of material interest to consumers." Fla. Stat. § 500.03(2)(b).

61. The replacement of cherries and natural flavor with DL-Malic Acid, an artificial flavoring ingredient is "of material interest to consumers," because these highlighted ingredients cost more than manufactured chemical compounds and because consumers seek to avoid artificial flavors. Fla. Stat. § 500.03(2)(b).

62. The promotion of the Product's cherry taste as "Naturally Flavored" not only does not prominently or conspicuously disclose that its taste was from artificial flavoring but fails to disclose it contains more artificial flavor than natural flavor.

63. The failure to disclose the source of the Product's cherry taste misleads consumers who expect they are buying a product whose taste comes only from cherries and natural flavors.

64. "Made with Real Fruit Filling" is misleading because even though its taste is from the cherries shown on the package, it includes artificial flavoring in the

form of DL-Malic Acid for its cherry taste.

65.   The result is that the Product is "misbranded" and misleads consumers to expect the filling's taste is only from the identified ingredients of cherries and natural flavors, which is false, because its taste comes in part from the artificial flavoring ingredient of DL-Malic Acid.

66.   The result is that the Product is "misbranded" and misleads consumers to expect the filling's taste is only from the identified ingredients of cherries and natural flavors, which is false, because its taste comes in part from the artificial flavoring ingredient of DL-Malic Acid. 21 U.S.C. § 343(a)(1); Fla. Stat. § 500.11(1)(a).

67.   The Product is "misbranded" and misleading because its labeling fails to conspicuously display the required information that its cherry taste is provided by artificial flavoring. 21 U.S.C. § 343(f); Fla. Stat. § 500.11(1)(f).

68.   The Product is "misbranded" and misleading because it includes the artificial flavoring of DL-Malic Acid but "it [does not] bear[s] labeling stating that fact." 21 U.S.C. § 343(k); Fla. Stat. § 500.11(1)(k).

69.   The Product is "misbranded" and misleading because "Naturally Flavored Cherry Fruit & Grain Cereal Bars" is not a truthful or non-misleading "common or usual name." 21 U.S.C. § 343(i); Fla. Stat. § 500.11(1)(i).

70.   "Naturally Flavored Cherry Fruit & Grain Cereal Bars" does not

"accurately identif[y] or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." 21 C.F.R. § 102.5(a); 21 C.F.R. § 101.3(b)(2).

71.  This is because it fails to disclose the source of the cherry taste, based on the presence of DL-Malic Acid, which imparts the taste of cherries. 21 C.F.R. § 101.22(i)(2).

72.  Federal and state regulations require that because the filling's taste is represented as "Cherry – Naturally Flavored," yet contains DL-Malic Acid that imparts the flavor of cherries, "Cherry" is required to "be accompanied by the word(s) 'artificial' or 'artificially flavored,'" such as "Artificial Cherry Flavored Fruit & Grain Cereal Bars" or "Artificially Flavored Cherry Fruit & Grain Cereal Bars." 21 C.F.R. § 101.22(i)(2).

73.  Instead, "Cherry" is accompanied by the term, "Naturally Flavored," which is false and misleading based on the use of DL-Malic Acid, an artificial flavoring ingredient, present in a greater amount than natural flavoring.

## VI.  CONCLUSION

74.  By adding the synthetic ingredient of DL-Malic Acid, purchasers do not receive a product that is "Cherry Naturally Flavored" but one that is artificially flavored.

75.  By adding the synthetic ingredient of DL-Malic Acid, purchasers get a

smaller amount of cherry and natural flavors than what is promised by the front label.

76.    Consumers buying fruit filled cereal bars labeled as "Cherry" and "Naturally Flavored," without any indication that artificial flavoring provides the Product's taste are seeking to avoid synthetic ingredients like DL-Malic Acid, created in a laboratory.

77.    As a result of the false and misleading representations and omissions, the Product is sold at a premium price, approximately $2.13 for 8 bars (295 g), excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

78.    Plaintiff is a citizen of Florida.

79.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

80.    The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

81.    Plaintiff is a citizen of Florida.

82.    Defendant is a citizen of Delaware based on its corporate formation.

83.    Defendant is a citizen of Arkansas based on its principal place of business.

84.    The class of persons Plaintiff seeks to represent includes persons who

are citizens of a different state from which Defendant is a citizen.

85.  The members of the proposed class Plaintiff seeks to represent are more than one hundred, because the Product has been sold at the approximately 386 Walmart stores in this State and online to citizens of this State.

86.  The Court has jurisdiction over Defendant because it transacts business within Florida and sells the Product to consumers within Florida from the approximately 386 Walmart stores in this State and online to citizens of this State.

87.  Defendant transacts business in Florida, through the sale of the Product to citizens of Florida from the approximately 386 Walmart stores in this State and online to citizens of this State.

88.  Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

89.  Defendant has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

90.  Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by

misleading them as to its contents, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

91.  The Court has jurisdiction over Defendant because it transacts business within Florida and sells the Product to consumers within Florida from its 386 Walmart stores in Florida.

92.  The Court has jurisdiction over Defendant because it has committed tortious acts within this State through the labeling, distribution and/or sale of the Product, which is misleading to consumers in this State.

93.  The Court has jurisdiction over Defendant because it has committed tortious acts outside this State by labeling, representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, attributes, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

**VENUE**

18

94.    Plaintiff resides in Hillsborough County.

95.    Venue in the Tampa Division of this District is based on Plaintiff's residence in Hillsborough County.

96.    Venue is based on Plaintiff's residence in Hillsborough County because a substantial or entire part of the events or omissions giving rise to her claims occurred in Hillsborough County, including her purchase of the Product based on the representations and omissions identified here.

97.    Venue is based on Plaintiff's residence in Hillsborough County because this is where her causes of action accrued, including her purchase, payment of money for or towards, use and/or consumption of the Product.

98.    Plaintiff purchased, paid money for or towards, used and/or consumed the Product in reliance on the representations and omissions identified here in Hillsborough County.

99.    Plaintiff first became aware the representations and omissions were false and misleading in Hillsborough County.

## PARTIES

100. Plaintiff Mackenzie Irwin is a citizen of Hillsborough County, Florida.

101. Defendant Walmart Inc. is a Delaware corporation with a principal place of business in Benton County, Arkansas.

102. Walmart is an American multinational retail corporation that operates

over 5,000 supercenters throughout the nation, selling everything from furniture to groceries.

103. While Walmart sells leading national brands of products, it also sells many products under one of its private label brands, Great Value.

104. Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

105. Previously referred to as "generic" or "store brand," private label products have increased in quality, and often are superior to their national brand counterparts.

106. Products under the Great Value brand have an industry-wide reputation for quality.

107. In releasing products under the Great Value brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

108. Walmart gets national brands to produce its private label items due its loyal customer base and tough negotiating.

109. Private label products under the Great Value brand benefit by their association with consumers' appreciation for the Walmart brand overall.

110. That Great Value-branded products met this high bar was or would be proven by focus groups, which rated them above their name brand equivalent.

111. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands [like Great Value] are good alternatives to national brands, and more than 60 percent consider them to be just as good."

112. Private label products generate higher profits for retailers like Walmart because national brands spend significantly more on marketing, contributing to their higher prices.

113. The development of private label items is a growth area for Walmart, as they select only top suppliers to develop and produce Great Value products.

114. Plaintiff is like most consumers and prefers foods with natural ingredients and natural flavors.

115. Plaintiff is like most consumers and tries to avoid foods with artificial flavors, based on the belief they are potentially harmful, not natural and unhealthy.

116. Plaintiff is like most consumers and looks to the front label of foods to see what she is buying and to learn basic information about it.

117. Plaintiff is like most consumers and is accustomed to the front label of packaging telling them if what they are buying gets its taste from artificial flavoring.

118. Plaintiff is like most consumers and when she sees that a front label does not disclose artificial flavoring, she expects its taste is from the identified ingredients and/or natural flavoring.

119. Plaintiff is like most consumers and when she sees that a front label tells

her a product is "Naturally Flavored," she believes this, and expects that food's taste to come from any identified ingredients and/or natural flavor.

120. Plaintiff is like most consumers and when she sees a label that tells her a food is "Naturally Flavored," she does not expect its taste to be from artificial flavoring and/or that it will not contain artificial flavoring ingredients.

121. Plaintiff read, saw and relied on the label's statements of Naturally Flavored Cherry Fruit & Grain Cereal Bars with pictures of cherries, pictured above two bars with dark red filling, described as "Made with Real Fruit Filling" to expect its cherry taste was from cherries and natural flavors, not artificial flavor.

122. Plaintiff did not expect the Product contained a greater amount of an artificial flavoring than natural flavor.

123. Plaintiff relied on the omission of artificial flavoring from the front label as it related to the taste of the Product's filling.

124. Plaintiff did not expect that in addition to cherries and natural flavors, the Product's cherry filling would use artificial flavoring in the form of the synthetic compound of DL-Malic Acid to provide its cherry taste.

125. Plaintiff did not expect that the Product would use DL-Malic Acid in place of adding more cherries and natural flavors.

126. Plaintiff purchased the Great Value Cherry Naturally Flavored Fruit & Grain Cereal Bars in packaging with pictures of fresh cherries, described as "Made

with Real Fruit Filling," with the labeling identified here, at Walmart stores in Hillsborough County in Florida between July 15, 2019, and July 15, 2023.

127. Plaintiff bought the Product at or exceeding the above-referenced price.

128. Plaintiff paid more for the Product than she would have had she known its fruit filling's taste was from artificial flavoring instead of only from cherries and natural flavors, as she would have paid less.

129. The Product was worth less than what Plaintiff paid, and she would not have paid as much absent Defendant's false and misleading statements and omissions.

## CLASS ALLEGATIONS

130. Plaintiff seeks to represent the following class:

> All persons in Florida who purchased the Product in Florida during the statutes of limitations for each cause of action alleged.

131. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

132. Common questions of issues, law, and fact predominate and include whether Defendant's representations and omissions were and are misleading and if

Plaintiff and class members are entitled to damages.

133. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

134. Plaintiff is an adequate representative because her interests do not conflict with other members.

135. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

136. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

137. The class is sufficiently numerous and likely includes several thousand people.

138. This is because Defendant sells the Product to consumers from hundreds of its stores in the State Plaintiff is seeking to represent.

139. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"),
Fla. Stat. § 501.201, *et seq.*

140. Plaintiff incorporates by reference paragraphs 1-77.

141. The purpose of FDUTPA is "To protect the consuming public…from those who engage in…deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

142. This includes "making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(3).

143. FDUTPA considers any "unfair or deceptive acts or practices in the conduct of any trade or commerce [to be] unlawful." Fla. Stat. § 501.204(1).

144. Such "unfair or deceptive acts or practices" must be construed so that "due consideration and great weight shall be given to the interpretations of the FTC and the federal courts relating to [the FTC Act,] 15 U.S.C. § 45(a)(1)." Fla. Stat. § 501.204(2).

145. Violations of FDUTPA can be based on other laws and standards related to consumer deception. Fla. Stat. § 501.203(3).

146. An FDUTPA violation occurs whenever "Any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*." are violated. Fla. Stat. § 501.203(3)(a).

147. An FDUTPA violation occurs whenever "The standards of unfairness and deception set forth and interpreted by the Federal Trade Commission ('FTC') or the federal courts" relating to the FTC Act are violated. Fla. Stat. § 501.203(3)(b).

148. An FDUTPA violation occurs whenever "Any law, statute, rule, regulation, or ordinance which proscribes…unfair, deceptive, or unconscionable acts or practices" is violated. Fla. Stat. § 501.203(3)(c).

149. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

150. In considering whether a food's label is misleading, it is required to "take[] into account, among other things, not only representations made or suggested by statement, word, design, [] or in any combination thereof, but also the extent to which the labeling or advertisement fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts concerning ingredients in the food, which facts are of material interest to consumers." Fla. Stat. § 500.03(2)(b).

151. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

152. This is because consumers prefer food that gets its taste from ingredients and natural flavors and seek to avoid artificial flavors.

153. The labeling of the Product violated the FTC Act and thereby violated FDUTPA because the representations and omissions of "Cherry Naturally Flavored

Fruit & Grain Cereal Bars" created the erroneous impression the filling's taste was only from cherries and natural flavor when this was false. Fla. Stat. § 501.203(3)(a).

154. The labeling of the Product violates laws, statutes, rules and regulations "which proscribe[]…unfair, deceptive, or unconscionable acts or practices," thereby violating FDUTPA. Fla. Stat. § 501.203(3)(c).

155. The labeling of the Product violated FDUTPA because the representations and omissions that its filling's cherry taste was only from cherries and natural flavor, when it contained more added artificial flavoring in the form of DL-Malic Acid than natural flavor, was unfair and deceptive to consumers. Fla. Stat. § 501.204(1).

156. The labeling of the Product violated FDUTPA because the representations and omissions its cherry taste was only from cherry and natural flavor, when it contained added more artificial flavor in the form of DL-Malic Acid than natural flavor, was contrary to the Food Safety Act, which adopted the FFDCA and accompanying regulations.

157. The FFDCA and its regulations prohibit consumer deception by companies in the labeling of food. Fla. Stat. § 501.203(3)(c).

158. These include the following federal and state laws and regulations described above.

|  Federal  |  State  |
| --- | --- |

| | |
|---|---|
| 21 U.S.C. § 343(a)(1) | Fla. Stat. § 500.11(1)(a) |
| 21 U.S.C. § 343(f) | Fla. Stat. § 500.11(1)(f) |
| 21 U.S.C. § 343(k) | Fla. Stat. § 500.11(1)(k) |
| 21 U.S.C. § 343(i) | Fla. Stat. § 500.11(1)(i) |
| 21 C.F.R. § 101.22(i)(2) | FL Admin Code § 5K-4.002(1)(d) |
| 21 C.F.R. § 101.3(b)(2) | FL Admin Code § 5K-4.002(1)(d) |
| 21 C.F.R. § 102.5(a) | FL Admin Code § 5K-4.002(1)(d) |

159. Plaintiff believed the Product's cherry taste was only from cherry and natural flavors, even though it contained more added artificial flavoring in the form of DL-Malic Acid than natural flavor.

160.  Plaintiff paid more for the Product and would not have paid as much if she knew that in addition to cherries and natural flavors, its taste was from added artificial flavoring in the form of DL-Malic Acid.

161. Plaintiff seeks to recover for economic injury and/or loss she sustained based on the misleading labeling and packaging of the Product, a deceptive practice under FDUTPA, by paying more for it than she otherwise would have.

162. Plaintiff will produce evidence showing how she and consumers paid more than they otherwise would have paid for the Product, relying on Defendant's representations and omissions, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis and other advanced methodologies.

**COUNT II**

<u>False and Misleading Adverting,</u>
<u>Fla. Stat. § 817.41</u>

163. Plaintiff incorporates by reference paragraphs 1-77.

164. Defendant made misrepresentations and omissions of material fact, that the Product's cherry taste was only from cherries and natural flavor, even though it contained added artificial flavoring in the form of DL-Malic Acid, through its advertisements and marketing in various forms of media, product packaging and descriptions, and/or targeted digital advertising.

165. Defendant failed to truthfully disclose that the Product was artificially flavored, which it was required to do.

166. Defendant falsely stated the Product's Cherry taste was because it was "Naturally Flavored" even though it contained the synthetic ingredient of DL-Malic Acid, in a larger amount than natural flavor, which provided a cherry taste.

167. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

168. Defendant knew these statements and omissions were false and/or misleading.

169. Defendant intended for consumers to rely on its false statements and omissions for the purpose of selling the Product.

170. Plaintiff and class members did in fact rely upon these statements and omissions.

171. Reliance was reasonable and justified because of the public trust placed in foods sold under the Great Value brand, who expect them to be labeled accurately and in a non-misleading manner.

172. Plaintiff paid more for the Product, as she would not have paid as much if she knew that the filling's taste was not only from cherries and natural flavor, but artificial flavor, based on the synthetic flavoring ingredient of DL-Malic Acid.

173. As a result of Defendant's misrepresentations and omissions, Plaintiff and class members suffered damages in the price premium paid for the Product, which is the difference between what they paid for it and how much it would have been sold for without the false and misleading representations and omissions identified here.

## COUNT III
### Unjust Enrichment

174. Plaintiff incorporates by reference paragraphs 1-77.

175. Defendant received benefits and monies because it represented to Plaintiff and consumers that the taste of the Product's cherry taste was only from cherries and natural flavor, through the term, "Cherry Naturally Flavored," even though its cherry taste was from the artificial flavoring ingredient of DL-Malic Acid.

176. Principles of equity and good conscience prohibit Defendant from retaining profits made from the sale of the Product.

177. Plaintiff seeks disgorgement of such profits and establishment of a

constructive trust on behalf of the Class.

Jury Demand and Prayer for Relief

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   January 8, 2024

Respectfully submitted,

/s/ William Wright
The Wright Law Office P.A.
515 N Flagler Dr Ste P300
West Palm Beach FL 33401
(561) 514-0904
willwright@wrightlawoffice.com